**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| MIGUEL LARA-LEON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-00868-TWP-KMB |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER ON MOTION FOR RELIEF PURSUANT TO 28 U.S.C. § 2255**
**AND DIRECTING FURTHER PROCEEDINGS**

This matter is before the Court on Petitioner Miguel Lara-Leon's ("Lara-Leon") *pro se*

Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Pursuant to 28

U.S.C. § 2255 (Dkt. 4).   In April 2019, Lara-Leon pled guilty to six total counts including

conspiracy to launder money, conspiracy to distribute controlled substances, and distributing

heroin and methamphetamine.  He is serving a 21-year prison sentence.  Lara-Leon asks the Court

to vacate his conviction and sentence on grounds that he pled guilty without receiving effective

assistance of trial counsel.  Lara-Leon's submissions raise a colorable claim that his attorney did

not complete a good-faith effort to learn facts relevant to his sentencing before he pled guilty.  In

this Order, the Court identifies those issues that require further development, dismisses claims that

fail as a matter of law, and issues directions for the next phase of these proceedings.

**I. THE § 2255 MOTION**

A motion pursuant to 28 U.S.C. § 2255 is the presumptive means by which a federal

prisoner can challenge his conviction or sentence.  *See Davis v. United States*, 417 U.S. 333, 343

(1974).  A court may grant relief from a federal conviction or sentence pursuant to § 2255 "upon

the ground that the sentence was imposed in violation of the Constitution or laws of the United

States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  "Relief under this statute is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice."  *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013) (citing *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996); *Barnickel v. United States*, 113 F.3d 704, 705 (7th Cir. 1997)).

## II. <u>FACTUAL BACKGROUND</u>

Lara-Leon was indicted with four co-defendants in August 2017.  (Crim. Dkt.[1] 56.)  Indiana Federal Community Defender ("IFCD") counsel Joseph Cleary ("Cleary") was appointed to represent Lara-Leon and assisted him through sentencing. (Crim. Dkt. 33). A Second Superseding Indictment filed July 17, 2018, charged nine defendants, including Lara-Leon. (Crim. Dkt. 237.) In the Second Superseding Indictment, Lara-Leon was charged with seven counts: (Count 1) possession with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846; (Counts 2 and 3) distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1); (Counts 4 and 5) distribution of heroin, in violation of 21 U.S.C. § 841(a)(1); (Count 6) aiding and abetting the distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and (Count 11) conspiracy to launder money, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). (Crim. Dkt. 237.)

---

[1] Citations and references to Lara-Leon's criminal case, *United States v. Ochoa-Beltran, et al.*, Case No. 1:17-cr-00165-TWP-MJD, shall be referred to as ("Crim. Dkt.").

A.    **Guilty Plea**

The trial was originally scheduled for September 2017, then continued numerous times to March 12, 2018, July 16, 2018, December 3, 2018, and April 15, 2019.  (Crim. Dkts. 86, 100, 199, 235, 327.)  On March 12, 2019, the Court held a hearing with the four defendants scheduled for trial, pursuant to *Missouri v. Frye*, 566 U.S. 134 (2012), to affirm on the record that the defendants' attorneys communicated plea offers extended by the government.  (*See* Crim. Dkt. 671.)  At the *Frye* hearing, the Government stated that it had discussed likely United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") calculations with Cleary but had not extended a plea offer based on an understanding that Lara-Leon wished to proceed to trial.  *Id.* at 6:16–21.  In response to the Courts inquiry whether Cleary had that conversation with his client, Cleary stated,

> "A number of times, Your Honor, I've gone through what the government's calculation was; I've explained what the difference would be, in my opinion, if he pled open before trial and got his three levels. Mr. Lara-Leon has rejected that and expressed a desire to get something which is below the mandatory minimum, which has never been offered."

*Id.* at 6:22–75. Lara-Leon appeared at the hearing with the assistance of a Spanish-English language interpreter. Cleary confirmed that his client was prepared to proceed with trial and Lara-Leon did not deny or correct Cleary's statements.

The parties proceeded to a final pretrial conference on March 26, 2019.  (Crim. Dkt. 455.)  At the conference, counsel for one of Lara-Leon's co-defendants indicated that his client wished to plead guilty.  *Id.*  Two days later, Lara-Leon petitioned the Court to enter a guilty plea without the benefit of a plea agreement.  (Crim. Dkt. 462.)

On April 2, 2023, Lara-Leon again appeared with the assistance of a language interpreter and his counsel, Cleary. (Crim Dkt. 673 at 2:4–10).  Lara-Leon was sworn and stated on the record that he discussed his charges, defenses, and evidence thoroughly with Cleary, *id.* at 5:15–25–8:1-

22; that he was satisfied with Cleary's assistance to that point, *id.* at 8:23–9:1; and that the government could prove beyond a reasonable doubt, the elements of each of the charges, *id.* at 12:14–15:19. The Government presented the following factual basis for the plea of guilty:

> Beginning at least as early as January 2016 and continuing through July 17th of 2017, in the Southern District of Indiana, Indianapolis Division and elsewhere, the defendant, Miguel Lara-Leon, also known as Chaparro[,] co-defendants Ricardo Ochoa-Beltra[n], Cesar Salgado, Angelica Naomi Guzman-Cordoba[,] and others knowingly and intentionally conspired together to possess with intent to distribute and to distribute controlled substances.

> More specifically, Lara-Leon and his co-conspirators operated a drug trafficking organization, or DTO, that aimed to distribute and possess with intent to distribute the following drugs in the Indianapolis, Indiana, area: 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II nonnarcotic controlled substance; five kilograms or more of a mixture of substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance; and one kilogram or more of a mixture or substance containing a detectable amount of heroin, a Schedule I narcotic controlled substance.

> Lara-Leon advanced the DTO by, among other things, acting as a distributor for the organization. For example, on December 1st of 2016, Lara-Leon sold approximately 28.12 grams of methamphetamine to a confidential source in Indianapolis.

> On January 31st of 2017, Lara-Leon sold approximately 83.6 grams of methamphetamine to the confidential source in Indianapolis.

> On February 21st of 2017, Lara-Leon sold approximately 24.46 grams of heroin to the source in Indianapolis.

> On March 20th of 2017, Lara-Leon sold approximately 24.67 grams of heroin to the source in Indianapolis.

> And on April 17th of 2017, Lara-Leon arranged for an individual -- another individual to sell approximately 83.38 grams of methamphetamine to the confidential source, again in Indianapolis, Indiana.

> On each of these occasions, Lara-Leon knew that the substance being distributed to the source contained some kind of controlled substance.

> On July 17th of 2017, at a residence on Dearborn Street in Indianapolis, Indiana, which is located here in the Southern District of Indiana, Indianapolis

Division, Lara-Leon, Ochoa-Beltran, Salgado, and Guzman-Cordoba possessed the following items:  approximately 1.45 kilograms of heroin, approximately 2.14 kilograms of cocaine, approximately 55.94 grams of methamphetamine, drug ledgers, multiple firearms, and assorted ammunition.

On that same date, July 17th of 2017, Lara-Leon was driving a pickup truck in Indianapolis when he was stopped and arrested by law enforcement.  At the time of his arrest, numerous firearms and ammunition were in a crate in the bed of Lara-Leon's pickup truck.

That portion of the factual basis, Your Honor, addresses all of the drug counts.

With respect to Count 11, conspiracy to launder money, beginning at least as early as January 2016 and continuing through July 17th of 2017, in the Southern District of Indiana, Indianapolis Division and elsewhere, Lara-Leon, Ochoa-Beltran, Megan Castleton, Bryan Stocker, Joel Alvarado-Santiago, and other knowingly conspired with one another to commit offenses against the United States in violation of Section 1956 of Title 18 of the United States Code.

That is, they conspired to knowingly conduct and attempt to conduct financial transactions that involved the proceeds of specified unlawful activity, that is drug trafficking, knowing that the property involved in the transactions represented the proceeds of that drug -- of specified unlawful activity, and knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity.

More specifically, Lara-Leon and his co-conspirators operated a money laundering organization, or MLO, that served to launder the proceeds of the drug trafficking organization charged in Count 1.  The MLO was led by Ochoa-Beltran.  Ochoa-Beltran, on his own and through others, directed members of the money laundering organization, in Indiana and elsewhere, to use their bank accounts to funnel drug proceeds from Indiana to California.

Ochoa-Beltran directed members of the MLO, including the defendant, Lara-Leon, to make cash deposits of drug proceeds into various bank accounts in the Southern District of Indiana and elsewhere.  The account holders, such as Lara-Leon, made cash deposits in amounts less than $10,000.  Ochoa-Beltran then directed some of these account holders, including Lara-Leon, to transfer the deposited drug proceeds to bank accounts in California controlled by the DTO.  In many instances, members of the money laundering organization then withdrew the drug proceeds in the form of U.S. currency from the bank accounts in California.

For example, on or about September 17th of 2015, Ochoa-Beltran opened a Chase Bank account under an alias, "Alejandro Torres."  Between January 23rd and

27th of 2016 in Indianapolis, Indiana, approximately $8,390 in drug proceeds were deposited into a Chase Bank account held by Lara-Leon.

On January 27th of 2016, Lara-Leon transferred approximately $7,000 from his Chase Bank account to the Torres Chase account controlled by Ochoa-Beltran.

On June 27th, 2016, at the direction of Megan Castleton, an individual whose initials are CRH, deposited approximately $9,443.88 in drug proceeds into her Chase Bank account in Indianapolis.

On that same day, again at the direction of Co-conspirator Castleton, CRH transferred that same sum from her Chase Bank account to [Lara-]Leon's Chase Bank account.

Ochoa-Beltran also directed members of the money laundering organization to wire drug proceeds from Indiana to Mexico.

Alvarado-Santiago operated a money transmitting business here in Indianapolis. He used that business to wire drug proceeds from Indiana to Mexico on behalf of the Ochoa-Beltran drug trafficking organization. For example, on September 23rd of 2016, the DTO sent wire transfers in the approximately amounts of $708 and $990 from Alvarado-Santiago's business to Sinaloa, Mexico.

On or about April 17th of 2017, the drug organization sent wire transfers in the approximate amounts of $787, $860, $865, $890, and $955 from Alvarado-Santiago's money transmitting business in Indianapolis to Sinaloa, Mexico.

(Crim. Dkt. 673 at 18:22–23:16.)

Lara-Leon confirmed that he heard the factual basis presented by the Government, the factual basis stated was the truth as to what happened, and there was nothing he needed to change or correct about the factual basis. (Crim Dkt. 673 at 23-24.) He affirmed that he wished to plead guilty knowing that the Court had discretion to sentence him outside the Guidelines range and outside the range he discussed with Cleary. *Id.* at 15:20—17:3, 18:9–24:7. Thereafter, the Court accepted Lara-Leon's plea of guilty.

**B.   Sentencing**

Two of Lara-Leon's co-defendants, Angelica Naomi Guzman-Cordoba (co-defendant #4) and Joel Alvarado-Santiago (co-defendant #9), proceeded to jury trial between April 15 and 22,

2019.  Lara-Leon appeared for his sentencing hearing five months later, again with Cleary and an interpreter.  (*See* Crim. Dkt. 675.)

The Government asked the Court to apply a final Guidelines offense level of 43 and a criminal history category of I, which would call for a life sentence. (*See* Crim. Dkt. 633 at 12; U.S.S.G. § 5A (2018 ed.).)  The Probation Office reached the same calculations in the presentence investigation report ("PSR"). (Crim. Dkt. 568 at ¶ 77 (access restricted).)  Cleary raised three objections that would have reduced Lara-Leon's final offense level to 36—and his Guidelines range to 188–235 months—if sustained.

### 1.    Cleary's Objections

First, Cleary objected to a two-level increase on grounds that Lara-Leon "used violence, made a credible threat to use violence, or directed the use of violence."  U.S.S.G. § 2D1.1(b)(2). This increase was based on trial testimony that Lara-Leon (a) stood guard at the door while a co-conspirator beat a person they suspected of stealing drugs and as punishment, pulled the persons teeth out, and (b) participated in the kidnapping and beating of a co-conspirator following an interaction with law enforcement.  (*See* Crim. Dkt. 633 at 9.)  Cleary did not dispute the factual premise that Lara-Leon was present or that he was guarding the door during the teeth pulling, rather he argued that evidence of the first incident did not establish that Lara-Leon actually used, threatened, or directed the use of violence and evidence of the second incident was vague and based on hearsay.  (*See* Crim. Dkt. 675 at 10.)

With respect to the second incident, the Government argued that at trial, co-defendant Cesar Salgado ("Salgado" aka "Tigre") testified concerning the kidnapping and beating of Adonis Rodriguez, an unindicted co-conspirator.  The Government argued that Salgado's proffer statement to investigators was that the kidnapping was at the direction of Ochoa-Beltran and Lara-Leon.  *Id.*

at 10-11.  The Court overruled the objection and applied the increase, stating that "evidence of the kidnapping of Tigre at both -- at the direction of both Mr. Lara-Leon and Ochoa Beltran is sufficient to -- for the court to apply the enhancement, so that objection is overruled." (Crim. Dkt. 675 at 12:1-5.)

Cleary also objected to a proposed three-level increase on grounds that Lara-Leon "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(b).  In short, Cleary contended that the evidence showed Lara-Leon was a "hand-to-hand" drug dealer whose role was "really no different than anybody else."  (Crim. Dkt. 675 at 12:6–14:21.)  The Government presented argument explaining its evidence that Lara-Leon was in charge in Indianapolis and held a higher role in the organization. *Id*. at 15-16.  The Court sustained the objection in part and applied a two-level increase, finding that Lara-Leon was "an organizer, leader, manager, or supervisor in any criminal activity," but not necessarily one that involved five or more participants or was otherwise extensive.  *Id.* at 17:17–22.

Third, Cleary challenged the application of a two-level increase to Lara-Leon's offense level on the money-laundering offense for being convicted under 18 U.S.C. § 1956.  *See* U.S.S.G. § 2S1.1(b)(2)(B).  Cleary contended that applying a two-level increase to a money laundering offense for being convicted under the money laundering statute amounts to impermissible "double counting."  (Crim. Dkt. 675 at 17:24–18:9.)  The Court overruled the objection and applied the two-level increase.  *Id.* at 18:10–16.

### 2.    Lara-Leon's Objections

Lara-Leon used part of his allocution to accuse Cleary of offering ineffective assistance and raise numerous objections.  Most notably, Lara-Leon alleged that Cleary advised him to plead

guilty and promised that he would not receive a sentence greater than 188 months.  *Id.* at 25:6–15. Cleary explained that, as he discussed possible plea agreements with the Government in August 2018, he and the Government exchanged emails about likely Guidelines calculations.  When Lara-Leon expressed interest in pleading guilty seven months later, Cleary explained his likely Guidelines range based on the calculations he previously discussed with the Government.  He did not consult with the Government to verify whether it still agreed on that likely range.  In fact, during those seven months, and then while preparing for trial and trying Lara-Leon's co-defendants, the Government developed evidence of drug quantities that justified a four-level base offense level increase, plus the two-level violence enhancement.  *Id.* at 29:7–31:2.

### 3.   Sentence

The Court calculated Lara-Leon's final offense level at 42, placing his Guidelines range at 360 months to life in prison.  *Id.* at 21:8–12.  With a four-level reduction in base offense level and without the two-level violence enhancement—in other words, if the Court applied the calculations Cleary originally conveyed to Lara-Leon—he would have faced a Guidelines range of 188–235 months.  U.S.S.G. § 5A.

The Government argued for a sentence of 360 months.  (Crim. Dkt. 675 at 45:5–10.)  Cleary argued that a sentence as low as 188 months was appropriate.  *Id.* at 35:23–37:14. Relevant here, Cleary argued that a downward departure was appropriate because Lara-Leon was likely to be deported after his release from prison and that he would not be eligible as a non-citizen for certain Bureau of Prisons programs or relief available through the First Step Act.  *Id.* at 36:1–17.

The Court imposed a sentence of 260 months on each count, to be served concurrently.  *Id.* at 45:23-46:2.  The Court explained the downward variance was based on defendant's circumstances and characteristics, his health issue, to promote respect for the law, provide just

punishment and avoid unwarranted sentencing disparities among similar defendants. *Id*. at 46:3-7. Lara-Leon pursued an appeal, which the Court of Appeals for the Seventh Circuit dismissed on February 12, 2021. (Crim. Dkt. 750 at 4–8.) He filed his § 2255 motion in this Court on April 23, 2022. (Dkt. 1 at 12; *see also* Dkt. 1-1 (envelope postmarked April 28, 2022).)

### III. <u>DISCUSSION: TIMELINESS</u>

The Government asks the Court to deny Lara-Leon's § 2255 motion without regard for its merits because he filed it more than a year after the Seventh Circuit entered final judgment on his appeal. *See* Dkt. 13 at 11–12. Lara-Leon acknowledges that he filed his motion after the deadline but asks the Court to apply the doctrine of equitable tolling. (Dkt. 12 at 1-2.) Lara-Leon states that researching and preparing his § 2255 motion took longer than a year because he does not read or speak English fluently and because his access to relevant documents and research materials was limited due to COVID-19-related lockdowns in his prison. *Id.*

Equitable tolling is available in § 2255 actions, although movants are rarely capable of making the onerous showing it requires. *See generally Ademiju v. United States*, 999 F.3d 474, 476–77 (7th Cir. 2021). Nevertheless, the Government did not respond at all to Lara-Leon's equitable tolling argument. *See* Dkt. 13 at 11–12. The Government is aware that "'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.'" *Id.* at 19 (quoting *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003)). Because Lara-Leon raised equitable tolling unambiguously, the Government waived the issue by failing to respond. The Court will not dismiss the § 2255 motion as untimely and will proceed to the merits.

### IV. <u>DISCUSSION: INEFFECTIVE ASSISTANCE</u>

A § 2255 movant claiming ineffective assistance of counsel bears the burden of showing (1) that counsel's performance fell below objective standards for reasonably effective

representation and (2) that this deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 688–94 (1984); *Resnick v. United States*, 7 F.4th 611, 619 (7th Cir. 2021). If a petitioner cannot establish one of the *Strickland* prongs, the court need not consider the other. *Groves v. United States*, 755 F.3d 588, 591 (7th Cir. 2014).

To assess counsel's performance, the court must "apply an objective standard of reasonableness considering all the circumstances." *Bridges v. United States*, 991 F.3d 793, 803 (7th Cir. 2021). On the prejudice prong, a petitioner "must show that but for counsel's errors, there is a reasonable probability that the result would have been different." *Perrone v. United States*, 889 F.3d 898, 908 (7th Cir. 2018) (cleaned up). When the petitioner pled guilty, the prejudice inquiry "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). "In other words, . . . the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id*. The movant must meet this burden with "objective evidence that a reasonable probability exists that he would have" gone to trial but for counsel's errors. *United States v. Cieslowski*, 410 F.3d 353, 359 (7th Cir. 2005).

It is fundamental that the § 2255 movant faces the burden of demonstrating both deficient performance and prejudice. *See, e.g.*, *Williams v. United States*, 879 F.3d 244, 249 (7th Cir. 2018) ("To demonstrate prejudice, Williams had the burden to show a reasonable probability" of a different outcome "but for the failure by his counsel."); *Faucett v. United States*, 872 F.3d 506, 509 (7th Cir. 2017) ("Under . . . *Strickland* . . . , it was Faucett's burden to show that his attorney's performance was deficient and that he suffered prejudice as a result."); *Blake v. United States*, 723 F.3d 870, 879 (7th Cir. 2013) ("A party asserting ineffective assistance of counsel bears the burden of establishing" both deficient performance and prejudice.); *Barker v. United States*, 7 F.3d 629,

633 (7th Cir. 1993) ("Because counsel is presumed effective, the petitioner bears a heavy burden to prove that his counsel was ineffective and that his defense was actually prejudiced."); *United States v. Springs*, 988 F.2d 746, 749 (7th Cir. 1993) ("Further proceedings on this subject would be a waste of time, because Springs has no prospect of establishing the 'prejudice' that is an element of his burden under the sixth amendment."); *United States v. Davenport*, 986 F.2d 1047, 1049 (7th Cir. 1993) ("[T]he burden of both proof and persuasion is" the movant's).

## A.    Advice Regarding Guidelines Range

Lara-Leon primary argument is that Cleary failed to provide competent advice regarding his probable sentence and that this prejudiced him by causing him to plead guilty without an accurate understanding of his liability at sentencing.

The contours of Lara-Leon's argument are clear from the record and understandable given the sentence he ultimately received. When Lara-Leon expressed interest in pleading guilty in March 2019, Cleary provided probable Guidelines calculations based on his discussions with the Government seven months earlier.  Cleary admitted at the sentencing hearing that he did not confer with the Government to ensure that those calculations were still likely.

It is at least arguable that Cleary should have anticipated that Lara-Leon would face less favorable Guidelines calculations in March 2019 than the Government discussed with him in August 2018.  The base offense level for a drug trafficking offense is driven by the quantity of drugs involved.  *See generally* U.S.S.G. § 2D1.1.  Total offense levels can increase through conduct-based enhancements, like using violence or maintaining a premises for the purpose of distributing drugs. *See* U.S.S.G. §§ 2B1.1(b)(2), 2B1.1(b)(12).  It is unsurprising that the Government's seven months of trial preparation yielded evidence of drug quantities and conduct that supported a higher offense level.

The Government correctly notes that "[a]n inaccurate prediction of a sentence alone is not enough" to establish deficient performance by counsel. *Bethel v. United States*, 458 F.3d 711, 717 (7th Cir. 2006); *see* Dkt. 13 at 16–17. But Cleary's *prediction* is not the only relevant question. "A defendant can prove that his attorney's performance was deficient if he shows that his attorney did not make a good-faith effort to discover the facts relevant to his sentencing, to analyze those facts in terms of the applicable legal principles and to discuss that analysis with him." *United States v. Cieslowski*, 410 F.3d 353, 359 (7th Cir. 2005). The record does not tell, for example, whether Cleary learned of or inquired about evidence between August 2018 and March 2019 that established higher drug quantities or supported a violence enhancement. An evidentiary hearing is necessary to determine whether Cleary made a good-faith effort to discover the facts relevant to sentencing before advising Lara-Leon on his likely Guidelines range. *See Bethel*, 458 F.3d at 711 ("It is certainly possible in this situation that Bethel's attorney made a good-faith effort to learn all of the relevant facts and calculate a probable sentence and still made a mistake. . . . Because there was no hearing on the issue, however, there is simply not enough here to determine what efforts counsel undertook in calculating the sentencing range he communicated to Bethel.").

A hearing is also necessary to determine whether Lara-Leon was prejudiced by the advice he received from Cleary. The Government argues that Lara-Leon's ultimate sentence precludes any argument that he would have insisted on going to trial if advised properly about his likely Guidelines calculation. By pleading guilty, they note, Lara-Leon became eligible for a two-level reduction for acceptance of responsibility, which reduced his Guidelines recommendation from a flat life sentence to a range of 360 months to life. (Dkt. 13 at 17-18.) But the analysis is not so simple. Lara-Leon faced a serious possibility of a life sentence even after pleading guilty and obtaining the acceptance-of-responsibility reduction. Had he proceeded to trial, he could have

made a case for acquittal, and he would have had an opportunity to challenge evidence that was used to increase his offense level by far more than two levels. Lara-Leon might have determined that those opportunities outweighed the benefits of a guaranteed two-level reduction.

The dispositive question on prejudice is whether Lara-Leon would have insisted on proceeding to trial if he received competent advice regarding his likely sentencing range. *Hill*, 474 U.S. at 59. The record on this issue is not well developed, but it does not preclude Lara-Leon from showing prejudice. Cleary made plain at the *Frye* hearing that Lara-Leon was not eager to plead guilty. Cleary's statement at sentencing indicates that he advised Lara-Leon that his base offense level would likely be four levels lower than that which the Court applied and that he would not receive the two-level violence enhancement. With a final offense level of 36 (six lower than the level the Court applied), Lara-Leon's Guidelines range would have been 188 to 235 months. It is plausible that Lara-Leon was willing to plead guilty for a chance at a sentence between 188 and 235 months but would have refused to plead guilty (and forfeit any chance for acquittal or to challenge the evidence against him) with a likely sentence between 360 months and life in prison.

The Court cannot determine after its preliminary review that Lara-Leon received competent, non-prejudicial assistance from counsel, and the Court therefore cannot deny his motion out of hand. Rule 4, Rules Governing § 2255 Proceedings. Instead, the Court will appoint counsel to assist Lara-Leon and allow the parties to present additional evidence and argument on the questions of whether Cleary undertook good-faith factual and legal inquiries before advising Lara-Leon on the likely consequences of his guilty plea and whether Lara-Leon would have insisted on going to trial if competently advised.

**B.**     **Disclosure of Evidence and *Brady***

Lara-Leon next asserts that he was deprived of constitutionally effective representation because Cleary did not provide him access to evidence obtained in discovery and because Cleary permitted the Government to withhold evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  This argument is most charitably read as an argument that Cleary failed to obtain and consider all the evidence before advising Lara-Leon of his likely sentencing range.  The Court addressed that issue in Part IV(A) above, and Lara-Leon may further develop the issue with counsel's assistance.  To the extent Lara-Leon asserts that Cleary performed deficiently or prejudiced him by failing to share discovery or demand disclosure of *Brady* material, his claims are insufficient and require no further attention.

**1.**     **Disclosing Evidence**

Lara-Leon states that he pled guilty without fully understanding the strength of the Government's case against him because Cleary did not disclose any of the evidence that would have been used against him at trial.  (Dkt. 12 at 10.)  Instead, he learned about "most of the evidence against him" after it was presented at his co-defendants' trial.  *Id.*  He describes the trial evidence of the criminal enterprise as "extensive" and states that, because he did not learn about the evidence before pleading guilty, he had no opportunity "to challenge any of the false statements presented during the trial."  *Id.* at 10-11.

This challenge to Cleary's representation fails for at least four reasons.

First, counsel's "basic duties" require him "to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution."  *Strickland*, 466 U.S. at 688.  As the Government notes, this rule has not been extended to a requirement that counsel place every piece of evidence before his client's eyes.  *See*

15

Dkt. 13 at 19.  If Cleary did not provide Lara-Leon access to certain discovery, that alone did not render his assistance constitutionally ineffective.

Second, Lara-Leon stated under oath at his change of plea hearing that he and Cleary "talked about the government's evidence against" him.  (Crim. Dkt. 673 at 8:13–17.)  His claim is therefore at odds with his sworn testimony.  Perhaps Lara-Leon learned of *new* or *additional* evidence once the Government presented it at his co-defendants' trial, which occurred after Lara-Leon pled guilty.  But that does not mean Cleary failed to share the evidence and information he had *before* Lara-Leon entered his plea, as Lara-Leon testified.

Third, if Cleary did not adequately consult with Lara-Leon or keep him informed, the Constitution was violated only if Lara-Leon would have insisted on going to trial based on whatever evidence or information Cleary withheld.  *Hill*, 474 U.S. at 59.  The Court must consider how the withheld evidence or information would have benefitted Lara-Leon at trial.[2]  But Lara-Leon provides no information about the evidence he believes Cleary failed to share and therefore provides the Court no reason to find that it would have strengthened his case at trial.  In fact, Lara-Leon states the trial revealed "extensive" evidence of drug trafficking and money laundering. If anything, that would have *weakened* Lara-Leon's position at trial.

Fourth, Lara-Leon's co-defendants were convicted, *see* Crim. Dkt. 509 at 2, and trial evidence supported findings at sentencing that were unfavorable to Lara-Leon.  Without knowing more, the Court cannot determine that reviewing that evidence would have inspired Lara-Leon to stand trial.

---

[2] *E.g.*, *Warren v. Baenen*, 712 F.3d 1090, 1101–02 (7th Cir. 2013) ("*Strickland* itself provides that an attorney can fall below the objectively reasonable level of performance by failing to 'keep the defendant informed of important developments in the course of the prosecution.' . . . The crux of Warren's argument is that, had he been aware of the information he alleges Wynn withheld, he would have gone to trial and claimed self-defense. When a petitioner makes that claim, our prejudice analysis 'will depend largely on whether the affirmative defense likely would have succeeded at trial.'").

In short, the record does not support a finding that Cleary breached any duty to communicate or share evidence he had or information he knew with Lara-Leon. If he did, that evidence or information likely would not have increased Lara-Leon's ability to win acquittal at trial. To the extent he suggests Cleary failed to share evidence so damaging that it offered false confidence in his likely sentence if he pled guilty, Lara-Leon may pursue that argument as discussed in Part IV(A). Otherwise, he may not pursue relief from his sentence or conviction on grounds that Cleary failed to share evidence or information.

### 2.   *Brady* Violations

In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." 373 U.S. at 87. The Supreme Court later clarified that "[i]mpeachment evidence . . . , as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985).

Lara-Leon argues that he was subjected to a *Brady* violation "because the government at no time disclosed how it obtained eyewitness statements or the evidence that was disclosed during" his co-defendants' trial. (Dkt. 12 at 11.) He provides no clarification, however, regarding what this evidence was or how it would have aided him in proving his innocence or impeaching Government witnesses.

As discussed above, the record indicates that Cleary may not have obtained or considered all the evidence *against* Lara-Leon before advising him on his likely sentence. But there is no indication that he failed to obtain or consider any *exculpatory* or *impeaching* evidence, so *Brady* has no bearing on this case.

17

**C.**     **Objections to Guidelines Calculations**

Lara-Leon asserts that Cleary erred by "not challenging any of the sentencing enhancements," including his base offense level and other Guidelines calculations.  (Dkt. 12 at 12.)  However, the record shows that Cleary raised most of the objections Lara-Leon insists were necessary, and Lara-Leon has not identified evidence or information that would have supported the remaining objections.

**1.**     **Converted Drug Weight and Base Offense Level**

The PSR calculated Lara-Leon's base offense level for the drug charge at 36 based on the following reasoning:

> In total, law enforcement seized 17,764 kilograms of converted drug weight over the course of the investigation. In addition, according to the government, evidence at trial from drug ledgers, cooperator information, and the amount of laundered money (see below) were evidence of many, many more kilograms of methamphetamine, heroin, and cocaine having been trafficked. The government conservatively estimates the defendant to be responsible for at least 30,000 kilograms but less than 90,000 kilograms of converted drug weight for his participation in the DTO.

(Crim. Dkt. 568 at ¶¶ 22, 32.)  Cleary objected to that calculation, *see id.* at ¶ 19, but withdrew he objection at the sentencing hearing, *see* Crim. Dkt. 675 at 5:16–6:1. He did not explain why he withdrew that objection, and the Court determined that the base offense level was 36 "because, under the converted drug weight, the offense involves at least 30,000 kilograms but less than 90,000 kilograms of converted drug weight." *Id.* at 19:13–15.

Lara-Leon argues that a base offense level of 34 was proper because the amount of drugs *seized* equated to 17,000 kilograms of converted drug weigh under Guidelines § 2D1.1(c).  (Dkt. 12 at 12.)  However, the Guidelines clearly state that the base offense level is not strictly a function of drugs seized:

> Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. *See* §1B1.3(a)(2) (Relevant Conduct).

> *Where there is no drug seizure or the amount seized does not reflect the scale of the offense*, the court shall approximate the quantity of the controlled substance. In making this determination*, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved*.

U.S.S.G. § 2D1.1, n.5 (emphasis added).  The PSR and the Court's calculations were based on the types of evidence listed in Note 5, and Lara-Leon does not identify a basis on which Cleary could have objected to the consideration of such evidence.  Lara-Leon has not articulated a plausible ineffective assistance claim based on the base offense level calculation.

### 2.  Premises Enhancement

The Court applied a two-level enhancement on grounds that Lara-Leon "maintained a premises for the purpose of manufacturing or distributing a controlled substance."  U.S.S.G. § 2D1.1(b)(12).  At least one stash house was referenced in the factual basis presented at Lara-Leon's change of plea hearing.  (Crim. Dkt. 673 at 20:10–17 ("On July 17th of 2017, at a residence on Dearborn Street in Indianapolis, . . . Lara-Leon, Ochoa-Beltran, Salgado, and Guzman-Cordoba possessed . . . approximately 1.45 kilograms of heroin, approximately 2.14 kilograms of cocaine, approximately 55.94 grams of methamphetamine, drug ledgers, multiple firearms, and assorted ammunition.").)  Cleary did not object to this enhancement.  (Crim. Dkt. 675 at 34:4–6 ("I did not think there was a legitimate objection to the stash house or the guns.").)  Lara-Leon objected at the sentencing hearing, and the Court explained its basis for applying the enhancement:

> That stash house, that was—you were managing the stash house. That's why I applied those enhancements. There were firearms found in your house, and ammunition. And I saw it all laying on that table right there.

> So, based on the trial, I learned a lot about the conspiracy and what happened in this case. So those—those enhancements are applied appropriately.

*Id.* at 32:11–17.

Lara-Leon argues that Cleary performed deficiently in failing to object to the premises enhancement because "the government failed to present sufficient evidence to establish that Lara Leon [sic] lived in any of these houses. Government's assumption came from the testimony of cooperating witnesses, however[,] none of the testimonies were substantiated by evidence." (Dkt. 12 at 12.)  This argument fails for two reasons.

First, the enhancement applies if the defendant *maintained* a premises for the purpose of manufacturing or selling drugs. U.S.S.G. § 2D1.1(b)(12).  The Government did not need to establish, and the Court did not need to find, that Lara-Leon *lived in* any of the stash houses to apply the enhancement.

Second, the enhancement applies if its elements are established by a preponderance of the evidence. U.S.S.G. § 6A1.3 (commentary) ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case."); *United States v. Austin*, 806 F.3d 425, 433 (7th Cir. 2015) ("[A] sentencing court may rely on facts established by a preponderance of the evidence.").  The Court found that evidence presented at Lara-Leon's co-defendants' trial supported the conclusion that he maintained at least one stash house.  Perhaps more evidence could have substantiated that conclusion, but Lara-Leon does not identify any evidence to contradict it.  Accordingly, the Court cannot find any basis on which Cleary could have objected to the enhancement.

### 3. <u>Money Laundering Enhancement</u>

Lara-Leon was convicted of one count of conspiring to launder money in violation of 18 U.S.C. § 1956.  Guidelines § 2S1.1 is used to calculate the offense levels for several offenses, of which § 1956 money laundering is only one.  The Guidelines account for differences between

these offenses by adding offense-specific enhancements.  *See* U.S.S.G. § 2S1.1(b)(2)(A) (one level

for a conviction under 18 U.S.C. § 1957); § 2S1.1(b)(2)(B) (two levels for a conviction under 18

U.S.C. § 1956).

Lara-Leon contends that the Court engaged in impermissible "double counting"[3] when it

applied the two-level enhancement directed by Guidelines § 2S1.1(b)(2)(B) and that Cleary

rendered ineffective assistance by failing to object.  This claim fails for two reasons.

First, there was no error and no meritorious basis for an objection. "Double counting"—

applying multiple sentencing enhancements based on the same conduct—"raises no constitutional

concerns."  *United States v. Vizcarra*, 668 F.3d 516, 519 (7th Cir. 2012).  Because "double

counting is strictly a matter of guidelines interpretation," it "is generally permissible unless the

text of the guidelines expressly prohibits it."  *Id.*  "There is no general rule against 'double

counting'; there is only a need for the judge to count as the Guidelines themselves count." *United

States v. Ray*, 831 F.3d 431, 435 (7th Cir. 2016).  In the case of § 1956 money laundering, the

Guidelines expressly require a two-level enhancement.  Counting "as the Guidelines themselves

count," *id.*, required the Court to apply the two-level enhancement.

Second, Cleary objected to the enhancement *even though* it was required by settled law so

Lara-Leon could raise the issue on appeal and challenge the Circuit precedent on double counting.

---

[3] Lara-Leon also asserts—in name only—a violation of the Fifth Amendment's protection against double jeopardy.
The Northern District of Indiana recently and concisely explained the difference between double jeopardy and double
counting:

> The Fifth Amendment protection against double jeopardy protects against multiple punishments for
> the same offense. *Shiro v. Farley*, 510 U.S. 222, 229 (1994). When calculating the guidelines
> sentencing range, double counting is "using the same conduct more than once to increase a
> defendant's guidelines sentencing range." *United States v. Vizcarra*, 668 F.3d 516, 519 (2012).

*United States v. Abatie*, No. 2:16-CR-47-JVB-JEM, 2022 WL 4944191, at *2 (N.D. Ind. Oct. 4, 2022). The essence
of Lara-Leon's argument is that his sentence is longer than it should be, not that he received two sentences for the
same offense. Therefore, the Court addresses his claim as a double-counting claim.

THE COURT: Any other objections?

CLEARY: One other one, Your Honor, and I did not add this to my—this will be very brief, but I would object on number 41. And I know it's technically correct, but I do think it's—I've felt—

THE COURT: The 1956?

CLEARY: I've always felt it's double counting to plead to money laundering and then get a money laundering enhancement. I don't—I've never understood that, I don't understand it today, and I maintain its double counting. I realize that I've lost that argument, but I would like to preserve it.

THE COURT: All right. And I will overrule that objection. The Sentencing Commission has said that it's not double jeopardy or double counting. Maybe on review they'll tell us something otherwise, but I will—

CLEARY: Sometimes things change.

THE COURT: They do. So I'll—but I'll overrule the objection and we'll see what happens.

CLEARY: Thank you.

(Crim. Dkt. 675 at 17:23–18:17.)  In this instance, Cleary advocated as competently and zealously

for Lara-Leon as the law allowed.

### 4.   <u>Use of Violence</u>

The Court applied, over Cleary's objection, a two-level enhancement based on evidence

that Lara-Leon "used violence, made a credible threat to use violence, or directed the use of

violence."  U.S.S.G. § 2D1.1(b)(2).  As discussed in Part II(B)(1), Lara-Leon contends this

increase was based in part on trial testimony that he stood guard at the door while a co-conspirator

beat a person they suspected of stealing drugs and pulled out his teeth.  Lara-Leon argues:

Contradicting is the fact that Julio Robles is willing to expose government's false theory, as well as he is willing to provide X-rays depicting that he is not and have not missed [sic] any of his teeth.

In the case at hand, the government has based its increase of two-levels based in [sic] false and unsupported evidence.

> In the case at hand, Lara's [sic] attorney should have interviewed Mr. Julio Robles
> prior to Mr. Lara's [sic] sentencing and disprove government's erroneous theory.

(Dkt. 12 at 15.)  This argument fails for two reasons.

First, nothing in the record or in Lara-Leon's petition suggests that Cleary should have doubted that the tooth-pulling incident occurred or that Lara-Leon participated in it. Certainly, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  But the Sixth Amendment does not demand that "defense counsel must track down every lead or must personally investigate every evidentiary possibility before choosing a defense and developing it." *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987).  Lara-Leon does not state that he told Cleary that the tooth-pulling incident did not happen.  If it did not, it is puzzling that Lara-Leon did not say so when he raised his own objection to the use-of-violence enhancement.  *See* Crim. Dkt. 675 at 31:25–32:4 ("I'm not in agreement with the two points, the two extra points that was assessed for the weapons or the two extra points for violence, the two extra points for stash house, and the two extra points for money laundering.").  The Court cannot find that every reasonable attorney would have chased down the victim of the tooth-pulling incident just to make sure it occurred as described under oath by witnesses at trial, even without any indication to the contrary from his client.

Regardless, the failure Lara-Leon alleges could not have prejudiced him.  As both Cleary and the Government noted at sentencing, the use-of-violence enhancement was supported by evidence of two incidents.  (Crim. Dkt. 675 at 6:6–9 ("Your Honor, as I understand it, there's sort of two episodes which the government references there in the offense conduct section and then in the government's sentencing memo."), 9:7–8 ("There are two incidents which show that the enhancement applies.").)  Moreover, the Court stated that evidence of the kidnapping of Tigre at the direction of both Mr. Lara-Leon and Ochoa Beltran was sufficient for it to apply the

enhancement, "so that objection is overruled." (Crim. Dkt. 675 at 12.) Lara-Leon does not allege that Cleary performed deficiently as to evidence of the second incident, which satisfied the elements of the enhancement.

### 5. Role Enhancement

Lara-Leon argues that Cleary was constitutionally ineffective in opposing an enhancement based on evidence that he "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). As the Court noted in Part II(B)(2) above, Cleary objected thoroughly to the enhancement, and he succeeded in the sense that the Court applied only a two-level (instead of a three-level) role enhancement. (Crim. Dkt. 675 at 12:6–14:21, 17:17–22.)

Lara-Leon asserts that the enhancement was based on evidence from two witnesses and that Cleary should have challenged the credibility of one of them. (Dkt. 12 at 15-16.) But he does not assert that their testimony was untrue. He does not explain what grounds Cleary would have had to challenge one witness' credibility or how challenging one witness' credibility (but not the other's) could have raised a reasonable probability that the Court would not have applied the enhancement at all. Therefore, his challenge to the role enhancement fails.

### D. *Smith* Reduction

Nearly 30 years ago, when the Guidelines were mandatory rather than advisory, *see United States v. Booker*, 543 U.S. 220 (2005), the Court of Appeals for the District of Columbia Circuit held that district courts *could* depart downward from the Guidelines range "where the defendant, solely because he is a deportable alien, faces the prospect of objectively more severe conditions than he would otherwise." *United States v. Smith*, 27 F.3d 649, 650 (D.C. Cir. 1994). As examples, the *Smith* court considered that deportable aliens would not be eligible to spend portions of their

sentences in minimum security facilities, community corrections centers, or home confinement, but other inmates could achieve eligibility for such conditions. *Id.* at 650–51. Although the Guidelines are no longer mandatory, the District of Columbia Circuit recently held that an attorney can perform deficiently by failing to seek a downward variance based on *Smith*. *United States v. Thomas*, 999 F.3d 723, 733–34 (D.C. Cir. 2021).

The Seventh Circuit has held that the considerations addressed in *Smith* create "a permissible basis, in exceptional circumstances, for a downward departure." *United States v. Guzman*, 236 F.3d 830, 834 (7th Cir. 2001). This Court is not aware of any Seventh Circuit decision analogous to *Thomas*, holding that failure to pursue a *Smith* departure can amount to ineffective assistance.

Nevertheless, Lara-Leon contends that Cleary performed unprofessionally by failing to seek a downward departure based on *Smith*. The record shows otherwise. Cleary did not cite *Smith* by name, but he explicitly asked the Court to apply a "significant departure" from the Guidelines range because Lara-Leon's status as deportable alien would leave him ineligible for sentence reductions and educational and vocational opportunities:

> I never promised Lara-Leon a sentence of below 188 months, but in our discussions, I told him I thought that was a reasonable sentence. And today, even, I think it's a reasonable -- 188 months is a reasonable sentence. I understand the Court has given already sentences that are above that, and so I understand the Court's likely not going to agree with me there, but I do think a sentence of above 15 years followed by deportation, a sentence that he's going to have to do 85 percent, he's not going to be able to avail himself of the recent, you know, First Step Act extra credit stuff because of the enhancements, his opportunities for education, vocational training will be restricted because he's not a citizen, and so I think a sentence of 188 months would be a significant sentence. And I realize the Court is not likely to go with that, but I do think that there is room for a significant departure below the 360 to life, Your Honor.

(Crim. Dkt. 675 at 35:23–36:13.)

In short, Cleary sought a departure based on the same grounds Lara-Leon addresses in his brief.  The Court listened to counsel as Lara-Leon was sentenced below 360 to life, and given a downward variance based in part on his circumstances (which included being a deportable alien).  Cleary cannot be deemed deficient, and he certainly did not prejudice Lara-Leon, by failing to cite *Smith*, which would not have entitled Lara-Leon to any departure.

## V.  <u>CONCLUSION</u>

The IFCD is appointed pursuant to 18 U.S.C. § 3006A to represent Lara-Leon in this case.  The **IFCD shall have seven (7) days** from the date this Order is docketed, in which to appear in this action.  Recognizing that Cleary is an Assistant Federal Defender, the IFCD is likely unable to represent Lara-Leon, so substitute Criminal Justice Act counsel is given leave to appear on his behalf pursuant to 18 U.S.C. § 3006A(a)(2)(B).

Counsel for Lara-Leon will have **through Friday, November 10, 2023**, to file a supplemental brief addressing the issues that remain in this action, which are (1) whether Cleary undertook good-faith factual and legal inquiries before advising Lara-Leon on his likely sentencing range before he pled guilty, and (2) whether Lara-Leon would have insisted on going to trial if competently advised.  *See* Part IV(A) above.  The supplemental brief must include a statement of what discovery is necessary to properly develop each issue.

The claims and issues addressed in Parts IV(B), (C), and (D) are **denied** and therefore, **DISMISSED**.  In the event Lara-Leon prevails in this § 2255 action and proceeds to a resentencing hearing, he may, of course, challenge the calculations and enhancements, and seek the departures that are the subjects of those issues.  The Court will not, however, consider them as grounds for relief under § 2255.

The Government will have **30 days from the filing** of Lara-Leon's supplemental brief, to file a supplemental response.  The supplemental response will also include a statement of what discovery is necessary to develop each issue from the Government's perspective.

The Court will issue further orders after supplemental briefing is complete.  The Court also encourages the parties to confer and determine whether this matter may be resolved by agreement or stipulation.

**SO ORDERED.**

Date: September 8, 2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Miguel Lara-Leon, #15863-028
FEDERAL CORRECTIONAL INSTITUTION, BIG SPRING
1900 Simler Avenue
Big Spring, Texas  79720

Lawrence Darnell Hilton
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
lawrence.hilton@usdoj.gov

INDIANA FEDERAL COMMUNITY DEFENDERS
111 Monument Circle, Suite 3200
Indianapolis, Indiana  46204